**In the Matter of the Application for DISCIPLINARY ACTION AGAINST the Honorable Donavin L. GRENZ, Judge of the County Court.**

**JUDICIAL CONDUCT COMMISSION OF the SUPREME COURT OF the STATE OF NORTH DAKOTA, Petitioner,**

**v.**

**The Honorable Donavin L. GRENZ, Judge of the County Court, Respondent.**

**Civ. No. 950026.**

Supreme Court of North Dakota.

July 27, 1995.

---

Paul W. Jacobson, Asst. Disciplinary Counsel, Bismarck, for petitioner.

Donavin L. Grenz, pro se.

Orell D. Schmitz, of Peterson, Schmitz, Moench & Schmidt, Bismarck, for respondent.

PER CURIAM.

This is a disciplinary proceeding against Donavin L. Grenz, former judge of the county court for Emmons, Kidder, Logan and McIntosh counties. The Judicial Conduct Commission found that Grenz violated Rule 5 G, Rules of Judicial Conduct; N.D.C.C. § 27–07.1–06; and, through violations of 18 U.S.C. §§ 2 and 641, Rule 2 A, Rules of Judicial Conduct.[1] The Commission recommended public censure for each violation. Grenz seeks either dismissal of the application for disciplinary action or imposition of a private censure.

We are empowered under N.D.C.C. § 27–23–03(3), on the Commission's recommendation, to censure or remove a judge for a willful violation of the Rules of Judicial Conduct. *Disciplinary Action Against Wilson*, 461 N.W.2d 105 (N.D.1990). We review the Commission's findings and recommenda-

---

1. Because the challenged conduct occurred before January 1, 1994, the former Rules of Judicial Conduct, rather than the current North Dakota Code of Judicial Conduct, govern.

tions de novo on the record. *Judicial Quali-fications Commission v. Schirado*, 364 N.W.2d 50 (N.D.1985). Although our review is de novo, we accord due weight to the hearing body's findings because the hearing body had the opportunity to observe the demeanor of the witnesses. *Judicial Quali-fications Commission v. Cieminski*, 326 N.W.2d 883 (N.D.1982). Before a judge may be censured or removed, the charges must be established by clear and convincing evidence. *Matter of Cieminski*, 270 N.W.2d 321 (N.D. 1978).

After graduating from law school and becoming licensed in 1973, Grenz opened a private practice in Linton and was employed as its city attorney. In 1977 or 1978, Grenz was appointed by the city council to the Linton Municipal Airport Authority [LMAA], a "public body corporate and politic" [§ 2–06–02, N.D.C.C.] that has as its purpose the maintenance of Linton's airport services. Grenz was elected multi-county judge in November 1982 and began serving in that capacity in early 1983. Grenz was reappointed and continued serving on the LMAA after becoming a judge, the majority of the time as LMAA president. Grenz did not resign from the LMAA until 1992.

On August 17, 1982, Grenz, as president of the LMAA, executed a "Resolution/Authori-zation" in which the LMAA resolved that it would apply for participation in the federal government surplus property disposition program, *see* 40 U.S.C. §§ 484 *et seq.*, which is administered at the state level by the Office of Management and Budget, *see* N.D.Adm. Code Chapter 4–04–01. A requirement for obtaining surplus property, which appeared on the "Resolution/Authorization" form, was that, from the date of receipt of the property obtained under the program and through a specified period of time after it was placed in use, "the donee shall not sell, trade, lease, lend, bail, cannibalize, encumber, or other-wise dispose of such property, ... without the prior approval of GSA ... or the state agency...."

While Grenz was its president, LMAA obtained items of surplus property under the program. "Distribution Document" forms were used in obtaining the particular items of surplus property and would be signed by representatives of the LMAA. These forms contained the same terms and conditions that appeared on the "Resolution/Authorization" form. As a representative of LMAA, Grenz executed at least two "Distribution Docu-ment" forms. While Grenz was president of LMAA, he received newsletters from the North Dakota State Agency for Surplus Property sent to program participants which contained listings of available inventory and prominent reminders of the terms and condi-tions for the use and disposition of the prop-erty obtained.

In September 1986, Grenz applied to the state for "Designation as a Donee Screener," which would allow the screener to travel to military bases to directly acquire property for a program participant.

On August 16, 1990, Grenz drafted an agreement, and entered into it in his capacity as president of LMAA, with Michael L. Gu-nia. The agreement said various tools and other items of surplus property would be held "in trust for" LMAA "for the respective periods of time required by the Federal Ac-quisition Rules" and "thereafter conditioned upon payment of the sum of $239.50, said property shall belong solely to ... [Gunia] or his assigns." This agreement was made within the time period during which the property was not to be sold or leased.

On January 14, 1991, Grenz drafted anoth-er agreement under which LMAA agreed that Gunia could possess a loader, obtained through the surplus property program, after completion of an 18–month compliance peri-od, in exchange for Gunia's payment of $1,100. This agreement was also made with-in the time period during which the surplus property was not to be sold or leased.

Shortly before July 28, 1991, Grenz drafted a four-page "Agreement to Lease and Option to Purchase Bucket Scoop," which he signed in his capacity as president of LMAA. Un-der its terms, the LMAA leased to William Stramer a "payloader bucket scoop," ob-tained through the surplus property pro-gram, for 20 months commencing July 28, 1991, for $1,100. This agreement, too, was made within the period during which the

property was not to be sold or leased. The LMAA made a $400 profit on this transaction, which was the sole purpose of Grenz and the LMAA for obtaining the "payloader bucket scoop" from the surplus property program.

In 1992, the General Services Administration sent special agent Brian Murphy to investigate improprieties regarding the handling of surplus property in Linton. Murphy interviewed Grenz and took written statements from him on January 13, 1993, and February 10, 1993. In his February 10 affidavit, signed by Grenz and witnessed by Murphy, Grenz stated:

"I have not complied with the rules and regulations of the program. The lease agreement ... dated on July 28, 1991, was in violation[ ] of the aforementioned rules and is illegal. The bucket in question ... was acquired solely to lease to Mr. Bill Stramer to enable the Airport Authority to generate a profit. The loader acquired by Mike [Gunia] ... was acquired contrary to the aforementioned rules and regulations, the agreement which I entered into with Mike Gunia was therefore illegal. The bucket leased to Mr. Stramer was acquired fraudulently from N.D. Surplus property since it[ ]s intended use was misrepresented.... Over the past three years I have on at least one occas[ ]ion told individuals that surplus property could be acquired and immediately leased in violation of the rules and regulations of acquisition for the purpose of making money for their non-profit entity."

Grenz was not criminally prosecuted by either federal or state authorities.

■ We agree with the Commission's finding that Grenz's acceptance of appointment and service as a member of LMAA while serving as a judge constituted a violation of Rule 5 G of the Rules of Judicial Conduct, which provides:

"*Extra–Judicial Appointments.* Except as otherwise provided by law, a judge shall not accept appointment to a governmental committee, commission, or other position that is concerned with issues of fact or policy on matters other than the improvement of the law, the legal system, or the administration of justice. A judge however, may represent his country, state, or locality on ceremonial occasions or in connection with historical, educational, and cultural activities."

Although Grenz asserts the LMAA is as much a civic organization as "the KC's, Lions or veteran clubs," the record clearly shows that the LMAA is a governmental body that was not concerned with issues of fact or policy on the improvement of the law, the legal system, or the administration of justice. We recognize the difficulty faced by judges in small, rural communities who are often asked and expected as members of those communities to take their turn serving the community in various governmental roles. But the circumstances that arose over Grenz's membership on the LMAA highlight the need for the Rule's proscription. As the Commentary to Rule 5 G emphasizes, the Rule is "need[ed] to protect the courts from involvement in extra-judicial matters that may prove to be controversial. Judges should not be expected or permitted to accept governmental appointments that could interfere with the effectiveness and independence of the judiciary." *See also* J. Shaman, S. Lubet, J. Alfini, *Judicial Conduct and Ethics* § 9.04 (1990). There is clear and convincing evidence that Grenz violated this rule although his intentions were no doubt altruistic. Our failure to censure for the violation would signal other judges that similar activities are acceptable, leading to similar prohibited entanglements.

The Rules of Judicial Conduct also recognize that membership in civic organizations may create a conflict of interest and should, in those instances, be avoided. Rule 5 B of the Rules of Judicial Conduct. However, the prohibition of Rule 5 B is not absolute. The prohibition in Rule 5 G is absolute, regardless of the circumstances, to avoid, we believe, the very situation which arose in this instance.

■ We also agree with the Commission that, by drafting the agreements between LMAA and Gunia and Stramer, Grenz violated N.D.C.C. § 27–07.1–06, which provides:

"A judge of a county court may not act as attorney or counselor at law during his term of office. Any judge who willfully violates the provisions of this section is subject to removal from office."

Grenz asserts that merely "reducing a verbal agreement to writing on behalf of an organization to which you belong without any form of compensation being expected or received" should not be considered acting as an attorney or counselor at law within the meaning of the statute. We disagree.

■ Although it is not easy to define acting as an attorney or counselor at law under all circumstances, the drafting of legal instruments on behalf of others meets the definition. *See* Annot., *Validity and application of state statute prohibiting judge from practicing law*, 17 A.L.R.4th 829, at § 9[a] (1982); *Matter of Schwerzmann*, 408 N.Y.S.2d 187 (N.Y.Ct.Jud.1978); *In re Van Susteren*, 82 Wis.2d 307, 262 N.W.2d 133 (1978). *Cf. Disciplinary Action Against Larson*, 485 N.W.2d 345 (N.D.1992), *State v. Niska*, 380 N.W.2d 646 (N.D.1986), and *Cain v. Merchants Nat'l Bank & Trust Co. of Fargo*, 66 N.D. 746, 268 N.W. 719 (1936), addressing what constitutes the practice of law by a person without a license or an attorney under suspension. The statute does not limit its application to situations where legal services are rendered for personal financial gain. *See Van Susteren; Niska.*

Because the Commission determined that Grenz had committed criminal violations of 18 U.S.C. §§ 2 and 641,[2] the Commission further found that Grenz violated Rule 2(A) of the Rules of Judicial Conduct, which provides:

"A judge shall respect and comply with the law and shall act in such a manner that promotes public confidence in the integrity and impartiality of the judiciary."

Grenz argues that he attended a donee-screener class in the early 1980s conducted by the state and federal surplus property agencies where the class participants were informed that prior written approval for the lease or sale of surplus property was not required. Grenz emphasizes that no federal or state criminal charges were brought against him, and claims the February 10, 1993 affidavit he executed "was not voluntary."

Because we conclude there was a violation of Rule 5G of the Rules of Judicial Conduct and in view of the Commission's recommendation, it is unnecessary to and we do not decide whether or not Grenz's conduct constituted criminal violations of 18 U.S.C. §§ 2 and 641. *Compare Matter of Killam*, 388 Mass. 619, 447 N.E.2d 1233 (1983) [dismissal of a prosecution upon satisfactory completion of a court-imposed condition does not mean a judge has not committed a violation of law]; *In re Conduct of Roth*, 293 Or. 179, 645 P.2d 1064, 1069 (1982) ["It is the duty of this court to determine whether a violation of the canon has occurred, whether there has been a proven violation of law or not, regardless of whether criminal charges have been filed."].

■ Likewise, it is unnecessary to decide whether Grenz executed the affidavit voluntarily or whether Grenz was informed at a donee-screener class that his actions would

2. 18 U.S.C. §§ 2 and 641 provide:

"§ 2. *Principals*

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

"§ 641. *Public money, property or records*

"Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any

department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

"Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

"Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined under this title or imprisoned not more than one year, or both.

"The word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."

not violate the law. Here, Grenz accepted appointment to a governmental body in violation of the Rules of Judicial Conduct. Not surprisingly, because he was a judge, Grenz was perhaps deferred to as the LMAA member with the greatest legal expertise and began drafting legal documents on behalf of that governmental body in violation of state law. Those legal documents eventually became the focus of a federal investigation on possible federal criminal violations, and Grenz signed what amounted to a confession admitting to wrongdoing. Whether or not Grenz's conduct constituted a violation of federal law, there is clear and convincing evidence that Grenz did not "act in such a manner that promotes public confidence in the integrity and impartiality of the judiciary," thereby violating Rule 2(A).

Dismissal of the application for disciplinary action is not warranted under these circumstances. Grenz lost the 1994 election for district court judge, making removal an unavailable option. It is, of course, also not possible for this court to issue a private censure. *See Disciplinary Board v. Amundson*, 297 N.W.2d 433 (N.D.1980). Therefore, this opinion will serve as the censure to Grenz.

Censure ordered.

VANDE WALLE, C.J., and MESCHKE, LEVINE, NEUMANN and SANDSTROM, JJ., concur.